Reyes BARRERA, Jr.,
Petitioner-Appellant,

v.

Warren YOUNG, et al,
Respondents-Appellees.

No. 85–2851.

United States Court of Appeals,
Seventh Circuit.

Submitted June 11, 1986.

Decided July 9, 1986.

Jack E. Shairer, Office of State Public Defender, Madison, Wis., for petitioner-appellant.

Michael R. Klos, Dept. of Justice, Madison, Wis., for respondents-appellees.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

*Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), holds that when a suspect consents to take a polygraph test and explicitly waives the rights established by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the prosecution may use as evidence any statements the suspect makes to the examiner after the test is over. Reyes Barrera, like Edward Fields, agreed to a polygraph test; Barrera, like Fields, waived his rights under *Miranda* and made some damaging admissions. But Barrera, unlike Fields, did not get the polygraph test he anticipated. Persuaded by Barrera's demeanor before the test that Barrera wanted to confess, the examiner never turned on the machine. Barrera eventually proved the examiner right. We must decide whether the prosecution may use the confession.

## I

Barrera stands convicted of first-degree murder and armed robbery, for which he was sentenced to life plus 20 years. The evidence at trial allowed the jury to conclude that in October 1976 Barrera and Frederico Garcia drove from Michigan to Texas, robbing and killing those they met on the way. Barrera and Garcia picked up Barrera's brother Eduardo in Beaver Dam, Wisconsin. While in town they stole some liquor from the Park Avenue Liquor Store, a coat and some shotgun shells from a Shopko store. After test-firing their sawed-off shotgun, the trio returned to the liquor store. Barrera said he would rob the proprietor if she were alone. Garcia replied that she would see his face; he held up the shotgun and replied: "Well, what do you think I got this for?" Barrera emerged from the store with $90 and a spent shell; Janis Bussie, the proprietor, was dead. Later the trio robbed several gas stations. Barrera killed the attendant at one with the shotgun.

After being arrested Barrera maintained that Garcia had entered the liquor store and killed the proprietor. At trial, however, Barrera admitted doing the deed.

His defense was that the shooting was accidental; his hand trembled, said he, because of withdrawal from heroin, and when Bussie reached for the gun it went off. Garcia contradicted this story, telling the jury that Barrera killed Bussie without provocation and had said that he killed the proprietor when she had the "nerve" to argue with him. Barrera conceded that he had told Garcia that he shot Bussie as she reached for the phone, but he said that this tale (like the tale to the police about Garcia doing the shooting) had been concocted. The truth, he insisted at trial, was that although he cocked the shotgun before entering the store, he did not mean to kill Bussie.

Robert Anderson, a polygraph examiner, told the jury that Barrera had confessed to killing Bussie without provocation. Anderson entered the picture when Barrera and his lawyer asked for a polygraph examination. Barrera and Garcia were blaming each other, and it was to Barrera's advantage to verify his own version of events. Anderson tested Barrera on March 7 and March 17, 1977. Each time Barrera was so anxious that the test did not produce reliable results. Anderson therefore suggested a third test, to which Barrera and his lawyer agreed. On April 4 Barrera confessed to Anderson before Anderson turned on the machine for this third test.

On each of the three occasions Anderson read Barrera the warnings prescribed by *Miranda,* and both Barrera and his lawyer signed written statements waiving the rights. The first two tests were administered at the State Crime Laboratory in Madison. Barrera's lawyer watched the tests through a one-way mirror, under an agreement with Anderson to stop the test if the lawyer tapped on the mirror. Each test was completed. On April 4 Anderson went to the Dodge County jail, where Barrera was being held. The jail did not have a room in which Barrera's lawyer could watch the test, but the lawyer was stationed outside the door, and Barrera testified that he knew he could stop the ques-

tioning and summon his lawyer at a moment's notice.

After Barrera and his lawyer heard the *Miranda* warnings—including the advice that anything Barrera said could be used against him—and signed the written waiver, Anderson may have told Barrera that the "results" of the test could not be used in evidence. "May have told" because although no one testified to such a reservation, Barrera's counsel stated in argument during a hearing that Anderson had given this advice. The remark would have been a reference to *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974), which held that unless prosecutor, defendant, and the defendant's lawyer sign a stipulation before the test begins, the results of the test (the graphs produced by the machine) and testimony explaining these results are not admissible at trial. (*State v. Dean*, 103 Wis.2d 228, 307 N.W.2d 628 (1981), later held that polygraph evidence is not admissible even with a stipulation, but this has no bearing on our case.) Barrera did not sign a *Stanislawski* stipulation before any of the tests. But Wisconsin has wrestled with the extent to which testimony concerning statements before the machine is turned on (or after it is turned off) may be introduced into evidence. Both before and after Barrera's encounters with Anderson, the Supreme Court of Wisconsin held that statements sufficiently unrelated to the mechanical portion of the test may be used. *State v. Schlise*, 86 Wis.2d 26, 271 N.W.2d 619 (1978) (statements immediately after the test are inadmissible); *Turner v. State*, 76 Wis.2d 1, 250 N.W.2d 706 (1977) (statements six days after the test are admissible); *McAdoo v. State*, 65 Wis.2d 596, 223 N.W.2d 521 (1974) (statements immediately after the test are admissible if there is a clear break). The Supreme Court of Wisconsin held that Barrera's statements to Anderson on April 4 were admissible under *Stanislawski* because sufficiently unrelated to the making or interpretation of the polygraph machine's output. *Barrera v. State*, 99 Wis.2d 269, 282–89, 298 N.W.2d 820, 826–29 (1980), *cert. denied*, 451 U.S. 972, 101 S.Ct. 2051, 68 L.Ed.2d 352 (1981).

The answers were unrelated to the machine's output because Anderson never turned the machine on. Anderson began his customary pre-test interview. He testified that he always asks some questions about the crime with which the test will be concerned. This time Anderson showed Barrera the results of a polygraph test of Garcia and told Barrera that he interpreted these results as showing that Garcia had spoken the truth in saying that Barrera had fired the shot and told his companions that the murder was deliberate. According to Anderson, he then sensed that Barrera was about to confess, and he continued asking questions. Anderson had to sense this, because Barrera said nothing. Most of the interrogation, which lasted 45 minutes, was recorded. It is a monologue by Anderson. Apparently Barrera nodded and grunted in places, but he answered no questions until Anderson asked if he would confess if the tape were turned off. Barrera said he would. Anderson turned off the tape; Barrera broke down, cried, and confessed. Five minutes later Anderson turned the tape on again and dictated into the tape what Barrera had said. Then Barrera asked for his lawyer. Anderson stopped the questioning and let in the lawyer, who must have been startled to learn that Barrera had fessed up without being hooked up.

The trial court found that Barrera knew that his lawyer was available and demonstrated his ability to act on this knowledge by calling for the lawyer. The court found the confession voluntary. The Court of Appeals of Wisconsin reversed the conviction in an unpublished opinion, holding that the admission of Anderson's statements violated the rules established by *Stanislawski* and ensuing decisions. It did not discuss whether the statements were voluntary. The Supreme Court of Wisconsin found the statements admissible under *Stanislawski* and agreed with the trial court that they were voluntary. 99 Wis.2d at 289–93, 298 N.W.2d at 829–31. The court concluded that Barrera, who was 26 at the time, understood English well, was

in good physical condition, and understood his rights well enough to exercise them to terminate the interview. This led the court to the conclusion that the statements were voluntary.

Justices Abrahamson and Heffernan dissented. 99 Wis.2d at 296–305, 298 N.W.2d at 832–37. They did not question the majority's conclusion that the confession was voluntary; instead, they concluded, Anderson had violated Barrera's right to counsel under the sixth amendment by questioning Barrera in a way counsel could not have anticipated. The questioning therefore was outside the scope of the waiver, the results inadmissible. The majority of the court did not discuss this possibility. In the district court, Barrera took both lines of argument; the district judge rejected both. The confession was voluntary, the court held, because Barrera, who knew what he was doing and recognized that he could stop the questioning in a trice, was not bamboozled or lied to. The interview did not infringe the right to counsel because Barrera's lawyer knew that Anderson would ask questions about the crime and had signed a waiver consenting to the use of the answers in court. Barrera renews both lines of argument on appeal.

## II

■ The district court reached the merits of both claims, but it is not obvious that either has been preserved for full adjudication. Although Anderson's questioning of Barrera was recorded, Barrera did not include the recording in the record before the Supreme Court of Wisconsin. As that court summarized things, "[o]ur knowledge of what transpired during the course of the interview is limited to that related to us in the parties' briefs and the testimony of Anderson and Garcia [sic] at the second [suppression] hearing and trial." 99 Wis.2d at 289 n. 6, 298 N.W.2d at 829. The district court, too, did not have access to the recording. We have only a general description of affairs—for example, testimony that Anderson told Barrera about Garcia's exam, and testimony that Ander-

son told Barrera that he "would have to face up to it [the crime] when he met his savior." *Id.* at 290, 298 N.W.2d 820. The "voluntariness" of a confession depends not only on whether it was a result of free choice but also on whether the interrogator's techniques "are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means". *Miller v. Fenton,* —— U.S. ——, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985). The incomplete record makes it difficult to decide whether Anderson's techniques were impermissible; we have only partial descriptions of them. The state court must have a complete opportunity to pass on a claim, *Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Duckworth v. Serrano,* 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981), and here it did not. As a result, all that Barrera has preserved for decision is an argument that the snatches of testimony *compel* a conclusion that the confession was involuntary. Barrera's choice to present an incomplete record to the state courts restricts the scope of review in federal court as well.

■ Barrera's argument about the right to counsel apparently was not presented to the state courts at all. The Supreme Court of Wisconsin listed four issues presented for decision and carefully pointed out that a fifth had been abandoned at oral argument. 99 Wis.2d at 275 & n. 3, 298 N.W.2d at 822. The right to counsel was not among these. So far as we can tell, this issue was introduced into the case by the dissenting justices. As a rule, a contention not presented to the state courts may not be resolved by the federal courts, whether because barred by a state procedural rule, see *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), or because the defendant has neglected to exhaust his state remedies. The state has not urged either of these approaches to preclusion. This circuit has not spoken with one voice on whether exhaustion of remedies may be waived by oversight, compare *United States ex rel. Russo v. Attor-*

*ney General of Illinois,* 780 F.2d 712, 714 n. 1 (7th Cir.1986) (collecting cases holding that court need not dismiss on its own motion for failure to exhaust), and *Walberg v. Israel,* 766 F.2d 1071, 1072 (7th Cir.1985) (describing question as open), with *Granberry v. Mizell,* 780 F.2d 14 (7th Cir.1985) (court may dismiss for failure to exhaust although state fails to raise the point; dicta state that even explicit waivers are ineffectual). Claims of forfeiture under *Wainwright* may be forfeited by the state's inattention in turn. *Boykins v. Wainwright,* 737 F.2d 1539, 1545 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *Washington v. Watkins,* 655 F.2d 1346, 1368 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). We therefore must determine whether Barrera has any remaining state remedies, for if he does he probably must pursue them. A single unexhausted claim would require the dismissal of the entire proceeding. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); but cf. *Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) (state may waive the "complete exhaustion" rule).

In Wisconsin a claim that challenges the admissibility of a confession that is not preserved at trial or on appeal may not later be presented on collateral attack. Matters that could have been raised at or before trial, but were not, generally may not be raised later. Wisconsin permits certain grave, constitutional issues to be resurrected even though bypassed at trial, e.g., *State v. Cleveland,* 118 Wis.2d 615, 348 N.W.2d 512, 521 (1984); *State v. Wedgeworth,* 100 Wis.2d 514, 302 N.W.2d 810, 818 (1981); *Upchurch v. State,* 64 Wis.2d 553, 219 N.W.2d 363 (1974), but a prisoner need not apply for such dispensations as part of the process of exhaustion of remedies. It is too late to raise as of right in state court the claim based on the sixth amendment, and state remedies are deemed "exhausted" when none is currently available. *Engel v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982); 28 U.S.C. § 2254(b) (defining exhaustion as "an absence of available State corrective process"). Cf. R. Lea Brilmayer, *State Forfeiture Rules and Federal Review of State Criminal Convictions,* 49 U.Chi.L.Rev. 741 (1982).

This is not a happy confluence of doctrines. The forfeiture rule of *Wainwright* is designed to induce defendants to comply with state rules in time to prevent unnecessary subsequent proceedings. A timely objection or contention may prevent the error from occurring and spare multiple courts the need to review a judgment. If the claim may be pressed on collateral attack even though it was not raised at trial or on appeal, the incentive to raise the claim in time is diminished. See *Nutall v. Greer,* 764 F.2d 462 (7th Cir.1985). Wisconsin uses rules of forfeiture on direct appeal and preclusion of collateral attack to maintain the appropriate incentives; these will be eroded if federal courts decide contentions that state courts will not decide. Exhaustion is largely about federalism; a federal court ought not to consider an issue when the state court has not had the opportunity to do so, to develop the facts, and, if appropriate, correct its own mistake. This doctrine, too, rests on the premise that a claim should be presented to the state courts as soon as possible to avoid the necessity for multiple layers of review.

Barrera's claim under the sixth amendment was not presented to the state courts, and so all of the considerations underlying *Wainwright* and the exhaustion doctrine are present. Barrera did not present the claim to the trial court in time to avoid the problem at the outset. He did not present the claim anywhere in the state system, so the facts are poorly developed and we lack the views of a majority of the Supreme Court of Wisconsin. Although Justice Abrahamson's dissent presented the majority of the court with an "opportunity" to address the subject, the majority did not do so—whether because it deemed the claim forfeit or the record incomplete we do not know. Yet *because* the state deems its forfeiture rule sufficiently important to foreclose collateral attack, Barrera has

"exhausted" his state remedies. *Engel,* 456 U.S. at 125 n. 28, 102 S.Ct. at 1570 n. 28. His inattention to the federal claim in state court is what authorizes the federal court to barge in. This leaves only *Wainwright* as a potential source of preclusion in federal court. And because the executive branch of a state may forfeit the protection of the *Wainwright* doctrine by inattention to it, the federal court must reach the merits.

The principle that the executive branch of a state may forfeit the protections of a doctrine based on forfeiture by the defendant is a sensible one, viewed in isolation. Forfeiture doctrines may be waived. It is established, for example, that if the state courts consider the merits of a claim without invoking rules of preclusion, federal courts may consider the merits in turn. *County Court of Ulster County v. Allen,* 442 U.S. 140, 152–54, 99 S.Ct. 2213, 2222–23, 60 L.Ed.2d 777 (1979); cf. *Phillips v. Lane,* 787 F.2d 208, 211–14 (7th Cir.1986) (if state both considers the merits and relies on a doctrine of preclusion, federal review is barred); *Goins v. Lane,* 787 F.2d 248 (7th Cir.1986) (same). Waiver of an argument based on *Wainwright* enables a federal court to avoid what may be a nettlesome question concerning the state's law of preclusion.* There is nothing magical about waiver by judicial decision. So far as the federal government is concerned, states may allocate governmental powers as they please. If a state authorizes its Attorney General to surrender the protection of some principle of law on behalf of the state, no principle of federal law interferes. To the contrary, if the federal court refused to accept the waiver, explicit or implicit, by the state through its Attorney General, this would be a meddlesome intrusion into the state's internal allocation of governmental authority. See *Ohio Bu-reau of Employment Services v. Hodory,* 431 U.S. 471, 477–80, 97 S.Ct. 1898, 1902–04, 52 L.Ed.2d 513 (1977), holding that a state's executive branch may waive the "comity" principles of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The Court thought it would be odd if principles of deference to the state's processes led it to refuse the state's request for an immediate decision. Comity means respect for the state's processes, and a state may choose to speak through any branch of its government. See also *Felder v. Estelle,* 693 F.2d 549, 554–55 (5th Cir. 1982) (Higginbotham, J., concurring). But cf. Comment, *State Waiver and Forfeiture of the Exhaustion Requirement in Habeas Corpus Actions,* 50 U.Chi.L.Rev. 354, 364–66 (1983). This also suggests, however, that a state is free to entrust to the judicial branch alone the power to surrender the protection of *Wainwright.* Either way it is a question of state law. Wisconsin has not done this; we therefore have no basis to refuse to reach the merits of this case, for the Attorney General has briefed them and does not invoke any principle of preclusion.

If the state wishes a different outcome, it may change its rules about who has the authority to speak for the state. For our part, federal courts ought to be aware that the interaction of the exhaustion doctrine and the possibility of waiver under *Wainwright* is propelling courts to consider, on the merits, claims that have never been before any state court. Ultimately this is not healthy for either judicial system or for the long run interests of defendants as a group.

### III

■ The "voluntariness" of a confession depends on the application of legal princi-

---

* Several considerations may separate forfeiture of a *Wainwright* claim from forfeiture of exhaustion of remedies. A refusal to accept a waiver of exhaustion of remedies means that the federal court avoids all issues on the merits, which makes a refusal to bypass exhaustion attractive. And the statutory basis of the exhaustion doctrine, 28 U.S.C. § 2254(b), is phrased in mandatory terms. If these are characterized as "jurisdictional," but cf. *Strickland,* 466 U.S. at 684, 104 S.Ct. at 2063, then the state's acquiescence does not authorize the federal court to decide. All of this simply points up what should be clear: we do not decide whether exhaustion of remedies may be waived or forfeited.

ples to facts, and the state court's decision that a confession is voluntary is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d), although any subsidiary findings of historical fact are covered by that statute. *Miller v. Fenton,* 106 S.Ct. at 451–54. The district court did not defer to the state's ultimate finding of voluntariness. Instead it made an independent decision, although one based on the state courts' findings of historical fact.

■ Barrera insists that his confession is involuntary because Anderson informed him of the results of Garcia's test and played on his religious sensibilities. He testified at the pretrial hearing that the revelation about Garcia weakened his resolve and that the discussion of religion tipped the balance: "[T]hat's my weak spot ... because I really love God" (quoted at 99 Wis.2d at 290, 298 N.W.2d at 830). Barrera contends that Anderson's tactics make the confession involuntary as a matter of law, even though he was 26, alert, and well aware that he could summon his attorney from the other side of the door. This is incorrect. Barrera knew that he would be tested on April 4 and had ample time to prepare himself mentally. A polygraph test may entail grueling questioning by an examiner aiming to trap the suspect; only by asking pointed or unexpected questions will the examiner be able to generate the physiological changes that the polygraph machine records. A preliminary conversation is part of every polygraph examination. This was a set piece, and it was Barrera's third encounter with Anderson. Whether a confession is voluntary depends on an appreciation of all the facts, see *Mincey v. Arizona,* 437 U.S. 385, 396–401, 98 S.Ct. 2408, 2415–18, 57 L.Ed.2d 290 (1978); *Woods v. Clusen,* 794 F.2d 293 (7th Cir.1986), and the fact that Barrera subjected himself to the wiles of a skilled examiner is very important.

A questioner may reveal other evidence in his possession. We would have a harder case if Anderson had lied about the results of Garcia's test, for that would be trickery,

but Anderson told the truth. No court has held a confession involuntary just because the questioner accurately informed a suspect that he had been implicated by someone else. See, e.g., *United States v. Rimka,* 512 F.2d 425, 426 (6th Cir.), *cert. denied,* 422 U.S. 1046, 95 S.Ct. 2663, 45 L.Ed.2d 698 (1975); *United States ex rel. Lathan v. Deegan,* 450 F.2d 181, 185 (2d Cir.1971), *cert. denied,* 405 U.S. 1071, 92 S.Ct. 1520, 31 L.Ed.2d 803 (1972). The truth may make a confession more likely, but it does this by enabling the suspect to make an informed choice, not by overbearing the will. Anderson's reminder to Barrera that if he believes in an afterlife he must consider the effect of his crimes and his failure to confess is again an appeal to Barrera's (very long run) self-interest. It is difficult to describe an appeal to religious beliefs as unacceptable in our society; such appeals are common parts of life and need not cease at the door of the jail. Barrera could have cut Anderson short and said that he wanted to hear such appeals only from a priest or a friend, but he did not. He found the appeal compelling, and a rhetorical device does not become illegitimate just because it is effective.

The remarks about Garcia and religion are not the "totality" of the interrogation, to be sure, but they are the only portions of it we need consider. Barrera did not present to the state's appellate courts or to us the full tape of the 45 minute interrogation. We are not authorized to guess at what would be found there or its significance. Similarly, we do not consider the effect of any promise by Anderson that the "results" of the test would be inadmissible. Perhaps Barrera could have taken this as a retraction of the *Miranda* warning that everything he said could be used against him, but he did not so testify in the state court, and the record does not contain evidence (as opposed to an argument of counsel) that Anderson made this statement. All we can hold, and all we do hold, is that when a suspect is psychologically prepared for interrogation, and has a lawyer seconds away, a 45 minute monologue including appeals to religion and reminders that the

state's evidence is strong does not make the ensuing confession involuntary.

## IV

■ In *Fields* the Supreme Court declined to consider the defendant's argument that the examiner's interrogation after the polygraph machine had been turned off violated his right to counsel under the sixth amendment. 459 U.S. at 49, 103 S.Ct. at 397. On remand, the court of appeals rejected the claim, holding that Fields and his lawyer, both of whom signed explicit waivers, knew or should have known that the examiner would try to obtain damning admissions after the test. *Fields v. Wyrick,* 706 F.2d 879, 881–82 (8th Cir.), *cert. denied,* 464 U.S. 1020, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983). Barrera tries to distinguish *Fields* on several grounds: that Anderson never intended to administer a polygraph test, so that the explicit waivers are ineffectual; that Anderson suggested the possibility of a third test, while Fields had asked for the test he received; that Anderson injected religion into the case, cf. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), nullifying the consent; and that both Barrera and his counsel supposed that the *Miranda* warnings were window dressing, given the absence of a signed *Stanislawski* stipulation. These reasons, taken together, Barrera concludes, make this case just like *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), in which the Supreme Court found it a violation of the sixth amendment to wheedle a statement from a suspect by trickery after the right to counsel has been triggered by an indictment.

The argument does not hang together. In *Massiah, Henry,* and *Maine v. Moulton,* — U.S. ——, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the suspect did not know that he was talking to an informer. He therefore could not intelligently waive his right under the sixth amendment to counsel—a right to the services of a lawyer as a go-between, if the suspect wishes to deal with the police only through counsel, or as an observer, if the suspect wishes to deal directly. Barrera and his lawyer knew that Anderson was working for the state. They knew that they were submitting to Anderson's questions; both signed waivers of the rights established by *Miranda.* They knew that the lawyer would not observe or hear the interrogation contemporaneously (although it would be taped). Although the state must "respect and observe the accused's choice to seek [legal] assistance", *Moulton,* 106 S.Ct. at 485, and has "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel", *ibid.,* the state need not protect the suspect and his counsel against improvident waivers. And although in *Brewer* the suspect knew that he was talking with the police, the police had promised counsel that they would not question the suspect. They violated the suspect's expressed desire to have counsel present for any interrogation. Nothing of the sort happened here; Barrera and counsel waived counsel's right to be present and knew that Anderson would ask probing questions. The right to counsel may be waived under the same standards used in the *Miranda* sequence. *Love v. Young,* 781 F.2d 1307, 1316–18 (7th Cir.1986). That standard was met here, as it was in *Fields.*

Anderson initiated the meeting of April 4, but this is unimportant. "[T]he identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to [the] decisions in *Massiah* or *Henry.*" *Moulton,* 106 S.Ct. at 486–87. So, too, it is unimportant that Anderson played on Barrera's religious convictions. This is just a form of interrogation, and Barrera knew he would be interrogated. *Brewer* involved an appeal to religion, but the nature of the appeal was important only to the conclusion that the officer's statement was a form of interrogation; it was the fact of interrogation, and not the method, that was objectionable in *Brewer.*

The argument that because they did not sign a *Stanislawski* stipulation Barrera and lawyer did not actually consent to interrogation that could be used against Barrera is at least potentially important, but it is unsubstantiated. Barrera testified at two pretrial hearings concerning the admissibility of his statements to Anderson. He did not say at either hearing that he believed that his statements would be inadmissible. To the contrary, he testified that he understood the *Miranda* warnings, including the admonition that what he said could be used against him. Whatever the status of polygraph tracings and their interpretation, no rule of federal law prevents the use of a suspect's oral statements before, during, or after a test. *Fields*, 459 U.S. at 48 n. *, 103 S.Ct. at 396 n. *. Given the absence of any claim of actual confusion, the nature of the protection under *Stanislawski* is an issue of state law only. Barrera's lawyer could have negotiated for a broader protection; he could have told Barrera not to waive the rights under *Miranda* and to insist on inadmissibility as the price of an examination. It is too late to return to the path not taken.

This leaves the contention that Anderson meant all along to grill Barrera without turning on the machine, an act that likely would have made any statements inadmissible under *Stanislawski*. Justice Abrahamson emphasized this, contending that Anderson's deceit vitiated the waivers. Barrera and his lawyer consented to a polygraph examination; they did not get one; Anderson never planned to administer one; and so, the argument concludes, there was no effective waiver of the right to have counsel present at a pure interrogation.

Why does Anderson's intent matter? Every polygraph examination begins with a preliminary discussion. Suppose Barrera had confessed in response to Anderson's second preliminary question. Would it have mattered that Anderson had meant to continue the questioning indefinitely without turning on the machine? Or suppose that Anderson meant to administer a regular test, as he testified, but suddenly changed his mind when Barrera appeared to be on the verge of a confession. The effectiveness of a waiver usually is viewed from the perspective of the suspect, not from the perspective of the questioner. See *Moran v. Burbine*, —— U.S. ——, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (that the police deceived a suspect's lawyer is not dispositive if the suspect did not know of the deceit and the waiver was otherwise voluntary). It is hard to peer into Anderson's mind. What matters is that Barrera and his lawyer knew that they were consenting to Anderson's questioning; they also knew that at least some of the questioning would precede the use of the polygraph machine, and that if Barrera should confess during this questioning the state would think it had struck gold. What happened to Barrera was within the range of expectations about what *would* happen to someone who consented to a polygraph exam.

This case does not turn on a conclusion that intent never matters, however, because no court has found that Anderson had the intent to question Barrera without administering an examination. Justice Abrahamson attributed this intent to Anderson, see 99 Wis.2d at 303–05, 298 N.W.2d at 836–37, but Anderson's testimony is to the contrary. He said that he was simply "setting the proper psychological set for the examination of Mr. Barrera." 99 Wis.2d at 301, 298 N.W.2d at 834. When Barrera's lawyer accused Anderson of perpetrating a subterfuge, Anderson testified: "That's not true. I came here to administer a polygraph examination to Mr. Barrera. I also came here to [elicit] a confession from him if Mr. Barrera was untruthful." See 99 Wis.2d at 301, 298 N.W.2d at 835 (brackets inserted by Justice Abrahamson). Barrera's failure to raise a sixth amendment challenge in the trial court or the Supreme Court of Wisconsin made it unnecessary for the state's judiciary to decide whether Anderson was telling the truth. Barrera did not ask the district court to hold an evidentiary hearing to probe Anderson's motives, and he has not asked us to remand for further pro-

ceedings on this score. We cannot assume that Anderson was lying. Barrera bears the burden of showing that his conviction violates the Constitution. He has not done this.

AFFIRMED.