Curtis **HENDERSON,**
Petitioner–Appellant,

v.

James **THIERET, Warden of the Menard Correctional Center and Neil F. Hartigan, Attorney General of the State of Illinois, Respondents–Appellees.**

No. 87–2975.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1988.

Decided Oct. 5, 1988.

As Amended Oct. 7, 1988.

Rehearing and Rehearing En Banc
Denied Nov. 10, 1988.

275 (1983).

Richard D. Murphy, Jenner & Block, Chicago, Ill., for petitioner-appellee.

David E. Bindi, Office of Ill., Atty. Gen., Chicago, Ill., for respondents-appellants.

Before CUMMINGS, COFFEY and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This appeal from the dismissal of Curtis Henderson's petition for habeas corpus once again thrusts us into the morass of procedural default and waiver.

We hold that a district court may, in considering a § 2255 or § 2254 petition, raise the question of procedural default *sua sponte* even where the state has failed to raise it. However, the court may not raise and consider procedural default where the state implicitly indicates a desire to waive that defense. Because we reach the merits of Henderson's habeas corpus and because we find that Henderson has failed to show that he was prejudiced, we affirm the district court's dismissal of the petition.

## I. FACTS

In 1972, Curtis Henderson was convicted in an Illinois state court of participating in a murder and attempted robbery. At trial, the evidence revealed that Henderson and a co-defendant, Charles Allen, used a sawed-off shotgun to waylay Charles and Janice Hayes, a young married couple, outside a neighborhood grocery store in an attempted robbery. Henderson and Allen followed the Hayes couple out of the grocery store, came up behind them and said, "this is a stickup," then to Mr. Hayes, "if she says anything, just one word, I'm going to let you have it." Henderson and Allen forced Mrs. Hayes into the passenger side of the Hayes' car. While Allen held the shotgun on him, Henderson searched Mr. Hayes for valuables. During the search, Mr. Hayes began to struggle with Allen. At that point, Henderson stopped searching Mr.

Hayes and started to run. Within a second or seconds after Henderson stopped searching, Allen killed Mr. Hayes with a shotgun blast. Then Allen also ran. Henderson and Allen later regrouped at Henderson's apartment. Henderson was arrested the next day.

Juvenile jurisdiction over Henderson (who was 15 at the time of the crimes) was waived and he was tried as an adult offender. At trial, conducted by Judge Robert E. Cherry,[1] Henderson was represented by Attorney George Lincoln of the Cook County Public Defender's Office. Following a jury trial, Henderson was convicted of both murder and attempted robbery. His sentencing was scheduled a few weeks after trial and before Judge Cherry, the same judge who had tried the case.

At sentencing, James Sammons, another public defender, substituted for Henderson's trial counsel. Attorney Sammons began his representation of Henderson by admitting that he was unfamiliar with Henderson's case file. Sammons then said:

> Needless to say, I think your Honor knows the facts of this case, and I am not too familiar with them. I gather that this boy was not physically present at the moment of the shooting, although....

Sammons continued:

> I gather from the notes Mr. Lincoln sent me[2] there was no disagreement on his [Henderson's] presence....

1. Judge Cherry, now deceased, normally handled civil cases but had agreed to take some criminal matters for vacationing Judge Earl Strayhorn.

2. The only thing with which Lincoln provided Sammons before sentencing was a half-page "case synopsis" in which he told Sammons in part:

> I would characterize the defendants as a bunch of frightened kids (arguing in mitigation). The defendant ran as soon as the deceased grabbed for the gun and the defendant was not present at the time for the shooting....

3. Direct Examination of Paul Bardney by Mr. O'Hara, Assistant States Attorney.

[MR. O'HARA]: Would you tell the ladies and gentlemen of the jury, if you can recall, what,

....

> ... I think it should be considered on the sentence that he was not physically present and apparently tried to break and run when it looked like there was going to be physical violence....

(Report of Proceedings before Hon. Robert E. Cherry pp. 677–78).

At this point, Judge Cherry impatient with Sammons' presentation, cut off Sammons and recounted his own version of the facts as he remembered them from the trial. The judge noted that Henderson "unfortunately did not play ball" but played with "sawed-off shotguns instead," (a reference to certain trial testimony[3]). The judge then said:

> This was a needless killing, done with premeditation because sawed-off shotguns kill people ... a sixteen millimeter [sic] shotgun that tore apart the stomach of the deceased who had a right to life just like these young men have a right to come before this court and ask for mercy and justice at this time.

Sammons then engaged the judge in a discussion about the judge's years in the legislature and gun legislation which prompted a long response from the court including the following:

> It's reprehensible and it's unbelievable that in our state we cannot successfully pass a law to protect our citizens from those kind of people getting—the people

if anything, you and Curtis Henderson and Charles Allen did regarding this [sawed-off shotgun] in the home of Curtis Henderson?
[JUDGE CHERRY]: This is before the shooting.
[MR. O'HARA]: Speak into the mike and tell the ladies and gentlemen of the jury what, if anything, you were doing with the gun while in the presence of Curtis Henderson and Charles Allen in the home of Curtis Henderson.
[PAUL BARDNEY]: We was messing around with it. We would be looking at it, you know, playing with it.
Q: Playing with it?
A: Yeah.
Q: Would you have anything to put in it?
A: No.
Q: When you say you would be looking at it and playing with it, do you mean each of the persons who was present?
A: Yes.
[Tr. p. 507].

who would be inclined to commit those kinds of crimes by guns, to pass a law successfully to prohibit them.

(Report of Proceedings p. 679).

At this point, Sammons attempted to steer the court back to the sentencing. But, the court, which by now had become extremely vexed at the state of the law and the nature of the offense he was dealing with, no longer wanted to hear from Sammons. Stating, "I think it's a duty of the court to protect society" and "I hope these young men can repent in whatever time they have to spend in jail," the court sentenced Henderson to forty to eighty years imprisonment.

With minimal input by Sammons, the sentencing was over. Sammons did not address any aspect of Henderson's pre-sentence report. Sammons did not call any witnesses on Henderson's behalf and did not request that Henderson be permitted to address the court. He had done no independent investigation of Henderson or his family.

After Henderson was sentenced to forty to eighty years for the murder and five to ten years for the attempted robbery, neither Lincoln nor Sammons filed a motion to reduce Henderson's sentence. When questioned about this at their depositions, both Lincoln and Sammons stated that they did not consider the sentence serious, under the state of the law at the time, because:

> at the time in a juvenile case 40 to 80 years did not necessarily mean that he would serve it because the law on juveniles at the time that a long sentence would be imposed, and ... if the man behaved himself at the Youth Commission, he would be discharged without having to serve a sentence.

(Deposition of Lincoln p. 17).

In short, neither Lincoln nor Sammons thought Henderson would serve his time.

After losing his direct appeal and his petition for postconviction relief, Henderson filed this (his second petition for

habeas relief[4]) alleging: (1) ineffective assistance of counsel at pre-trial; (2) ineffective assistance of counsel at trial due to counsel's failure to investigate; (3) ineffective assistance of counsel at sentencing; (4) ineffective assistance of counsel on direct appeal—which did not include a claim that appellate counsel should have raised ineffective assistance at trial and sentencing; and (5) ineffective assistance of counsel at the post-conviction hearing—which did not include a claim that post-conviction counsel should have raised a claim of ineffective appellate assistance. 671 F.Supp. 1193.

The district court ruled that Henderson waived the claims of ineffective assistance of counsel at pre-trial, trial, and sentencing because he failed to raise those claims on direct appeal. The court acknowledged that if Henderson could show cause for his failure to raise those claims on direct appeal, his procedural default would not act as a bar to his claims.

One possible reason for Henderson's procedural default could have been ineffective assistance of *appellant* counsel, as alleged in the second claim of Henderson's habeas petition. However, in that claim, Henderson did not make any allegations about appellate counsel's failure to raise the ineffectiveness of counsel at trial, pre-trial, and sentencing. Thus, the district court found appellate counsel's ineffectiveness could not constitute cause for Henderson's procedural default with respect to the claims concerning trial, pre-trial, and sentencing.

Moving up a tier, the district court next found that Henderson waived his claims of ineffective assistance on direct appeal because he failed to raise that claim at the subsequent post-conviction proceeding. Nor was post-conviction counsel's ineffectiveness an alleged basis for Henderson's failure to raise his claim at the post-conviction proceeding.

Finally, moving to the top rung, the district court found that Henderson waived his claim of ineffective assistance at the

---

4. Henderson filed a petition for writ of habeas corpus in the federal court in 1979 raising the same claims he raised on direct appeal. Those claims were considered on their merits and denied.

post-conviction proceeding by failing to raise that issue during the post-conviction appeal.

In sum, Henderson failed to allege that counsel's ineffectiveness at each succeeding level constituted "cause" for his failure to attack preceding counsel's effectiveness. Thus, Henderson had not shown cause for his procedural defaults.

The district court's analysis might have been a proper basis for dismissing Henderson's habeas petition on appeal but for one important fact. The state attorney general, in responding to Henderson's petition, never raised the issue of procedural default except with regard to Henderson's claim of ineffective assistance of counsel on direct appeal. Thus, Henderson, who on appeal is only interested in preserving his claim that he received ineffective assistance of counsel at sentencing, protested to the district court that any defense by the state based on procedural default had been waived.

In addressing Henderson's contention, the district court ruled that although the government had only raised waiver as a bar to one claim, it had orally represented that it was not waiving that defense as to any of Henderson's claims. In addition, even if the state forfeited its waiver defense, the district court ruled it was not bound by that forfeiture.

Henderson now appeals the district court's denial of his habeas petition arguing first, that the district court impermissibly raised the issue of waiver; second, that waiver, if it applies, is no bar to his claim because he has shown cause for his default; and third, that, if we must reach the merits of his claim, he was denied effective assistance of counsel at sentencing.

## II. WAIVER

■ Before considering a petition for habeas corpus on its merits, a district court must make two inquiries—whether the petitioner exhausted all available state remedies and whether the petitioner raised all his claims during the course of the state proceedings. If the answer to either of these inquiries is "no," the petition is barred either for a failure to exhaust state remedies or for a procedural default.

In this case, the district court was satisfied that Henderson exhausted all his available state remedies. Henderson filed a direct appeal, an appeal from the appeal, a petition for post-conviction relief, and an appeal from the dismissal of that petition— all the remedies available to him under Illinois state law. However, as we have already explained, Henderson did not raise the claims he now raises in his petition for habeas relief at the relevant state level. Normally, under the teaching of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), Henderson's claims would therefore be barred unless he can show "cause and prejudice" for his procedural default or that the denial of his petition would constitute a gross miscarriage of justice. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

This, however, is not the typical case. Henderson argues we need not consider whether he has shown cause and prejudice or whether a gross miscarriage of justice has occurred because procedural default should never have been an issue in this case. Henderson alleges the state failed to raise the issue of procedural default, and in fact, declined to apply it to all but his ineffective assistance of appellate counsel claim. Henderson claims because the state waived its defense, he was free to raise his claims in his petition for habeas relief. Under our holding in *Barrera v. Young*, 794 F.2d 1264 (7th Cir.1986), Henderson is correct. In *Barrera*, we held that the state's failure to raise the issue of procedural default could constitute a waiver of that defense and having waived its defense, the state would not be permitted to raise it on appeal.

However, once again, the events in this case take us one step further. Although the state did not raise procedural default at the district court with respect to some of Henderson's claims, the district court did. Not satisfied with the state's application of the procedural default defense to only one claim, the district court *sua sponte* applied

the defense to all of Henderson's other claims. Henderson challenges the court's authority to do so.

In *Granberry v. Greer*, 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), the Supreme Court was asked to decide "whether the state's failure to raise *non-exhaustion* in the *district court* constitutes a waiver of that defense in the *court of appeals.*" 107 S.Ct. at 1673 (emphasis added).[5] The Court answered that it depended on the circumstances of the case:

> If for example, the case presents an issue on which an unresolved question of fact or of state law might have an important bearing, both comity and judicial efficiency may make it appropriate for the court to insist on complete exhaustion to make sure that it may ultimately review the issue on a fully informed basis. On the other hand, if it is perfectly clear that the applicant does not raise even a colorable federal claim, the interests of the petitioner, the warden, the state attorney general, the state courts, and the federal courts will all be well served even if the state fails to raise the exhaustion defense, the district court denies the habeas petition, and the court of appeals affirms the judgment of the district court forthwith.

*Granberry*, 107 S.Ct. at 1675. Succinctly summarized in *Hickey v. Duffy*, 827 F.2d 234, 243 (7th Cir.1987), the Supreme Court, in effect, "suggested that cases with lop-sided arguments might be decided on the merits, while more difficult cases should be dismissed."

Henderson argues that *Granberry*, which calls our holding in *Barrera* into question, does not apply to his case for a number of reasons. First, *Granberry* involved a petitioner's failure to exhaust all his state remedies while his case involves an alleged failure to raise certain issues. Second, the district court did not raise the issue of non-exhaustion on its own in *Granberry*. Rather, the state belatedly raised the issue before the court of appeals. Fi-

nally, Henderson argues that in *Granberry*, the state completely *failed* to raise non-exhaustion at the district level. In this case, the state did raise procedural default but only as to one issue, thereby indicating that it was waiving that defense as to the remainder of Henderson's claims.

Henderson's first argument can quickly be resolved. In *Washington v. Lane*, 840 F.2d 443, 446 n. 2 (7th Cir.1988), we applied *Granberry*'s analysis pertaining to the waiver of a non-exhaustion defense to a procedural default defense by stating "the defense the state failed to raise before the district court was that of forfeiture, not of failure to exhaust state remedies. *Nevertheless, we find the analysis outlined in Granberry equally applicable....*" (emphasis added).

Henderson's second and third points are more troubling. With regard to the argument that the district court, not the state, raised the issue of waiver for the first time, we note that the state did raise the defense with respect to at least one of Henderson's claims and, in response to the court's questions, indicated that it was not waiving that defense as to Henderson's remaining claims. Thus, although the district court initiated the discussion of waiver, as it related to certain claims, we are satisfied that, *at least in this case*, the court's insistence on a pursuit of a waiver defense does not preclude the application of the *Granberry* analysis.

The remaining issue is whether the state, after being asked to consider procedural default, expressly or implicitly waived application of that defense to certain of Henderson's claims by failing to pursue that defense. As Henderson points out, it is one thing to omit the defense altogether in the district court and quite another to raise it as to one claim and yet fail to pursue it as to other claims, despite the district court's urgings. According to Henderson, the state's inactions at the dis-

---

**5.** In *Granberry*, the state failed to raise the non-exhaustion defense during habeas proceedings in the district court and then attempted belatedly to raise that issue on appeal. The court of appeals for the Seventh Circuit refused to consider the defense. *Granberry v. Mizell*, 780 F.2d 14 (7th Cir.1985).

trict court constituted an implicit waiver which cannot be ignored.

Henderson's arguments have credence. In *Barrera*, 794 F.2d at 1269, we said:

If a state authorizes its Attorney General to surrender the protection of some principle of law on behalf of the state, no principle of federal law interferes. To the contrary, if *the federal court refused to accept the waiver*, explicit or implicit, by the state ... *this would be a meddlesome intrusion into the state's internal allocation of governmental authority.*

During a status hearing, the district court asked the assistant attorney general the following:

My question to you is the only waiver by-pass argument you offer is that with respect to effective assistance of counsel on direct appeal ... it has occurred to me in the course of examining this that perhaps waiver and deliberate bypass may have a somewhat broader application, and the question I have for you is a direct one. *Are you waiving the waiver and deliberate by-pass act.*

(Transcript of Proceedings, Sept. 14, 1987, p. 7) (emphasis added). In response to the court's inquiry about the *Wainwright* waiver doctrine and its progeny, the Illinois assistant attorney general answered:

I would agree with the court that there is not waiver or deliberate by-pass argument that can be made with respect to the claim that counsel was ineffective for failing to conduct an investigation relating to the countermand[6] [sic] ... whether or not there has been a procedural default with respect to any of the other specific allegations of ineffective assistance of counsel ... it occurs to me that question—the questions in this case basically boil down to examinations of whether prejudice can be demonstrated.

... I had considered whether or not I should go back and take a second look at precisely what was raised on post-conviction and take a second look at whether or not procedural default arguments should be presented with respect to any other specific allegations, *and I don't really believe that it would advance the respondent's cause at this point in time* ... I don't think that it would alter the court's analysis is what I'm saying.

(Tr. pp. 7–8) (emphasis added).

It is evident, from the assistant attorney general's statement, that the state did not wish to pursue a waiver argument with respect to any of Henderson's claims except the ineffective assistance of appellate counsel claim. The state took this position because it believed that if it argued waiver, Henderson would reply that he had shown "cause and prejudice" for his procedural defaults. If the state did not argue waiver and the court were to consider the merits of Henderson's claims of ineffective assistance of counsel, Henderson would still be required to show that he was "prejudiced" by ineffective assistance of counsel. In the state's estimation, therefore, it made no difference whether waiver was pursued since the focus of either analysis was "prejudice" to Henderson.

Nevertheless, despite the assistant attorney general's statement that the state did not wish to pursue a procedural default argument, the district court ruled that Henderson waived his habeas claims by failing to raise them at the proper state proceeding.

■ We now hold that although a district court is permitted, under *Granberry* and its progeny, to consider a waiver defense belatedly raised by the state, even to raise that defense *sua sponte*, the court is not permitted to override the state's decision implicit or explicit (as we believe it was in this case) to forego that defense. We find, therefore, that the district court erroneously denied Henderson's petition for habeas corpus on the grounds of procedural default.

Ordinarily, the court's error would cause us to remand for a hearing on the merits.

---

**6.** It is likely the counsel said "counterman," in referring to Henderson's ineffective assistance of trial counsel charge. Henderson's contention in that claim, was that trial counsel failed to interview the store clerk or "counterman," who purportedly would have testified that Henderson fled before the shooting.

However, in this case, the district court went on to consider Henderson's claims on their merits, perhaps as a precautionary measure. The district court found, and we agree, that Henderson's claim that he received ineffective assistance of counsel at sentencing was viable. In the district court's words, "counsel's performance at sentencing was deficient in a number of respects."[7] But as the district court also found, although Henderson may have shown that sentencing counsel's performance was ineffective, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the landmark decision on ineffective representation claims, also requires that Henderson show that his defense was prejudiced by counsel's actions. This he cannot do.

Henderson, before addressing *Strickland*, attempts to argue that "prejudice" can be assumed, given the circumstances surrounding his sentencing, under the Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

In *Strickland v. Washington, supra*, the Supreme Court held that a defendant must show both that his counsel's performance was unreasonable under prevailing professional norms and a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 695, 104 S.Ct. at 2068. But in certain situations, ineffectiveness may be presumed without an inquiry into counsel's performance. *United States v. Cronic, supra*. The instances described in *Cronic* are however limited to those "when although counsel is available to assist the accused during trial, the likelihood that *any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate....*" 466 U.S. at 661, 104 S.Ct. at 2047 (emphasis added). ▮▮▮▮▮ We do not think this is a case where *Cronic* should apply. The circumstances surrounding Henderson's sentencing do not suggest that ineffective repre-

sentation was due to anything but a lack of preparation. A well-prepared lawyer might have been able to provide a more impressive presentation at sentencing, tailoring his argument to Henderson's background. However, attorney Sammons' actions in the case do not give rise to a presumptive finding of ineffective assistance of counsel pursuant to *Cronic*. We therefore agree with the district court that sentencing counsel's actions must be subjected to an evaluation under the *Strickland* test.

Under the first prong of the *Strickland* test, we must review sentencing counsel's performance. Although Sammons did attempt to argue in mitigation at Henderson's sentencing, did make the court aware of the principal mitigating factors (including Henderson's age and the fact that he ran when the murder occurred), and did read both the pre-sentence report and trial counsel's synopsis, we agree with the district court that counsel's performance was inadequate. Certainly sentencing counsel's unpreparedness was due mostly to trial counsel's last minute decision not to appear. Nevertheless, from the record, containing affidavits from two well-respected criminal law practitioners, there were a number of things sentencing counsel could have done, not the least of which would have been to request a continuance.

However, even though sentencing counsel's representation was deficient, Henderson still has the burden, under *Strickland*, of proving he was prejudiced as a result. The district court found that although counsel's performance was deficient, it "was not unacceptable." The district court evaluated evidence outside the record, submitted by Henderson in support of his contention that but for sentencing counsel's inadequacies, sentencing would have produced a different result. The court then said:

> The principal facts in mitigation were already known to the trial judge, petitioner's youth and the fact that someone

---

7. As we set forth in the facts, sentencing counsel did not review Henderson's pre-sentence report, was not familiar with Henderson's file, and did not interview Henderson's family and friends.

else had fired the lethal weapon. Second, a fair reading of the record makes it quite clear that the trial judge's sentence was based solely on the circumstances of the crime and the use of the weapon committing it. It is also clear from the remarks of the court that even had all the evidence here proffered been offered then, the sentence in all probability would be the same.

We agree. Given the severity of the crime committed (murder and attempted robbery), and the type of weapon used by Henderson's accomplice (a sawed-off shotgun), it is extremely unlikely that the evidence Henderson now claims he would have presented at the sentencing hearing would have had any effect on the sentencing proceedings, the sentencing judge was extremely concerned both with regard to the use of the sawed-off shotgun and the callousness of the young offenders. Based on the trial record and given Judge Cherry's strong concern about the type of weapon used in the commission of the murder, it seems unlikely that he would have been swayed by mitigating testimony of Henderson's family members. Those witnesses included his mother and brother who would have testified that Henderson worked part-time (a fact revealed to the judge during trial when Henderson took the stand), watched the other younger Henderson children, and did not have anything to do with gangs. (There was evidence to the contrary on this latter point.) Moreover, the alleged errors in Henderson's pre-sentence report (which was before the judge) were largely irrelevant to mitigation of the nature of the crime committed because they dealt primarily with such matters as Henderson's parentage and his attendance at church.

Finally, as both Lincoln and Sammons explained, although Henderson was tried and sentenced as an adult, no one expected him to serve his sentence in an adult penal facility. After sentencing, Henderson was remanded to the custody of the Youth Commission where, at the time he reached age 25 (eight years later), it was expected that he would be released. (As it was, because of additional problems with the Youth Com-

mission, Henderson was eventually transferred to Joliet State Penitentiary to serve his sentence.) Experience teaches us that given the nature of the murder, the sentencing judge, even if presented with additional evidence in mitigation concerning Henderson's relation with his family, was not likely to give a lesser sentence. The Illinois Court of Appeals, in ruling that the sentence imposed by Judge Cherry was not unconstitutionally excessive, also noted that although "Henderson was 15 years old when the crimes were committed" and had never been convicted previously, "he was a principal in an armed robbery where a shotgun was used to kill the man he was attempting to rob." Under those circumstances, the appellate court declined to disturb the sentence stating, "we see no reason ... to reduce the carefully considered sentence imposed by the judge who observed the defendant during the trial and who heard him testify." *People v. Henderson*, 39 Ill.App.3d 164, 351 N.E.2d 225, 230–33 (1st Dist., 1976).

Because he cannot show "prejudice" as required under *Strickland*, Henderson's claim that he was denied effective assistance of counsel at sentencing fails on its merits.

Although we find the district court should not have applied a waiver defense in the face of its implicit rejection of that defense by the state, we do not find it necessary to remand. The district court did consider the merits of Henderson's claim of ineffective assistance of counsel at sentencing and found it lacking under the *Strickland* standard. In the interest of federalism and comity, we therefore find that the order of the district court denying petitioner's petition for a writ of habeas corpus must be AFFIRMED.