**Raul Rudy SOTELO,**
**Petitioner–Appellant,**

v.

**INDIANA STATE PRISON and Linley E.**
**Pearson, Attorney General of the State**
**of Indiana, Respondents–Appellees.**

No. 87–2191.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1988.

Decided June 29, 1988.

Nick J. Thiros, Mark A. Thiros, Cohen & Thiros, Merrillville, Ind., for petitioner-appellant.

David A. Arthur, Deputy Atty. Gen., Indianapolis, Ind., for respondents-appellees.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Raul Rudy Sotelo was convicted by a state court jury in Indiana of the first degree murder of a young girl, and was sentenced to life imprisonment. He appeals the district court's denial of his writ of habeas corpus, contending that his confession was involuntary and that he was denied effective assistance of counsel during the state court trial. We affirm the district court on the issue of the voluntariness of Sotelo's confession. We do not have jurisdiction over his appeal regarding the effective assistance of counsel issue. The conduct which now forms the basis of Sotelo's claim of ineffective assistance of counsel was not presented for review by the Indiana state court.

## I. BACKGROUND

On September 27, 1973, a twelve-year old girl was found murdered in an isolated part of a cemetery in Lake County, Indiana. The body of the girl was unclad and her head had been crushed. On the day she was murdered, she had been seen in the company of Raul Rudy Sotelo, an eighteen-year old steel worker.

Two days later, in the afternoon of September 29, 1973, investigating officers of the Lake County, Indiana Sheriff's Department interviewed Sotelo at his home concerning the murder. Sotelo denied any knowledge of the matter. The officers left after about ten minutes but indicated that they would be back to obtain a written statement. Later that evening the officers returned to Sotelo's home. Sotelo agreed to accompany the officers to the Lake County Sheriff's Department.

After arriving at the Sheriff's Department, Sotelo sat in a locked hallway/waiting room for two hours while another suspect was questioned. Then Sotelo, accompanied by his mother, went with the officers to the detective bureau. There he was given the *Miranda* warnings and signed a written waiver of rights. With his mother present, Sotelo was then questioned intermittently. A typed statement was prepared at one point and Sotelo signed the statement in which he denied having any-

thing to do with the death of the girl. Thereafter, Sotelo was again verbally advised of his rights and the questioning continued—with the officers now disputing Sotelo's story. Sotelo continued to deny any involvement in the death of the girl. The officers told Sotelo that they did not believe him because of contradictory statements from other witnesses. One of the officers suggested that a lie detector test could be taken and Sotelo requested that one be given to him. The questioning then ended approximately two hours after it began and Sotelo was placed in custody pending a probable cause hearing.

Late the next morning, September 30, 1973, arrangements were made for Sotelo to take a polygraph examination in the office of a private polygraph examiner. The officers transported Sotelo to the polygraph examiner's office and again gave him the *Miranda* warnings. Sotelo was also advised that he did not have to submit to a polygraph examination. Sotelo nevertheless agreed to go forward with the test. The polygraph examination was administered to Sotelo while the officers watched in another room on closed circuit television.

When the initial testing had been completed by another operator, the reviewing polygraph examiner was of the opinion that Sotelo was not being truthful. Sotelo was then questioned by the examiner. It was at this point that Sotelo first confessed to

the murder. One of the detectives was then called into the examination room. Sotelo declined to have the *Miranda* warnings read again, and he repeated his confession to the officer. Sotelo was returned to the detective bureau where he again signed a waiver of his rights as well as a written confession indicating that he had repeatedly run over the young girl with his automobile after she refused to have sex with him. The police interrogation was tape recorded and the polygraph examination and questioning were video recorded.

Sotelo's written confession was introduced at trial. He was convicted and sentenced to life imprisonment. His direct appeal to the Indiana Supreme Court was unsuccessful[1] as was his appeal from denial of post-conviction relief.[2] Thirteen years later, Sotelo raised two claims in federal district court in his petition for a writ of habeas corpus under 28 U.S.C. § 2254. First, Sotelo argued that his confession was not voluntary[3] and, second, that he was denied effective assistance of counsel because his attorney declined to delete references in his written confession to the lie detector test. Both claims were rejected by the district court. We now address each claim in turn.

## II. CONFESSION

In his § 2254 petition, Sotelo alleged that he was improperly coerced into giving a

---

1. In *Sotelo v. State,* 264 Ind. 298, 342 N.E.2d 844 (1976), (Sotelo's direct appeal) the court addressed the issue of Sotelo's confession, the sufficiency of the evidence regarding his sanity, and the admission of certain allegedly gruesome photographs. Sotelo also unsuccessfully challenged the form of his *Miranda* warning. Sotelo's conviction was affirmed and with regard to the claim that his confession was involuntary, the Indiana Supreme Court found that:

   [T]he trial court in this case was presented with a complete record of the polygraph examination. The test had been videotaped and the recording and a written transcript of it were presented to the trial court. The record reveals no flagrant misstatements to the Appellant of the test results. The complained of examiner repeated his interpretation before the trial court. An expert called to dispute that interpretation admitted that differences of professional opinion are not uncommon. The record also reveals no blatantly coercive interrogation. The Appellant was certainly

coaxed into making his admissions. A reading of that interrogation, however, does not necessarily give rise to conclusions of coercion.
   ... [T]he trial court was presented with ample evidence upon which it could conclude that the confession was voluntary. We can therefore find no error in the admission of the Appellant's confession into evidence.
   342 N.E.2d at 848.

2. In *Sotelo v. State,* 273 Ind. 694, 408 N.E.2d 1215 (1980), (Sotelo's appeal of the denial of post-conviction relief) the court held that Sotelo was not denied effective assistance of counsel in his 1974 trial with respect to his attorney's failure to elicit lay opinion testimony regarding Sotelo's alleged insanity.

3. On appeal (and apparently in the district court) Sotelo did not pursue his earlier claim that the form used for his *Miranda* warnings was defective.

confession by the use of a polygraph examination. When presenting his case in district court, Sotelo focused his claim of an involuntary confession on the conduct of the polygraph examiner. Notwithstanding that focus in district court, however, Sotelo now claims on appeal that another factor also rendered his confession involuntary—specifically, he claims certain statements made by the police officers during his interrogation were false and thus coercive.

As to our standard of review, we have stated that the ultimate issue of the voluntariness of a confession is a legal question requiring *de novo* review. *United States v. Hawkins*, 823 F.2d 1020, 1022 (7th Cir. 1987).[4] It is the responsibility of an appellate court on review to "independently evaluate the admissibility of the confession" with regard to whether it was voluntarily given. *Miller v. Fenton*, 474 U.S. 104, 118, 106 S.Ct. 445, 454, 88 L.Ed.2d 405 (1985).[5] The Court mandated that the voluntariness of a confession is no longer an issue of fact presumed to be correct under 28 U.S.C. § 2254(d). *Id.*[6] *See also, Miller v. Fenton*, 796 F.2d 598, 601 (3rd Cir.1986) (on remand: an independent appellate examination is required to determine whether a challenged confession is voluntary). Because we must conduct a plenary review of the record, our examination of the voluntariness of Sotelo's confession must include, not only the claim of coercive conduct by the polygraph examiner argued in the district court, but also Sotelo's belated claim submitted to us, that the police interrogation was improper.

In our review of the state court record, as in the review of the record by the district court, when the issue of the voluntariness of a confession comes into play under § 2254, we follow the rule that "the federal courts are to presume state court factual findings are correct, if these findings are made after a hearing on the merits, and are fairly supported by the record." *Perri v. Director, Dept. of Corrections*, 817 F.2d 448, 450 (7th Cir.1987), *Estock v. Lane*, 842 F.2d 184, 186 (7th Cir.1988). *See generally Wainwright v. Witt*, 469 U.S. 412, 426–430, 105 S.Ct. 844, 853–855, 83 L.Ed.2d 841 (1985). However, "[t]he 'voluntariness' of a confession depends on the application of legal principles to facts, and the state court's decision that a confession is voluntary is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d), although any subsidiary findings of historical fact are covered by the statute." *Barrera v. Young*, 794 F.2d 1264, 1270 (7th Cir. 1986), citing *Miller v. Fenton*, 106 S.Ct. at 451–54. In this case, the historical facts and circumstances surrounding Sotelo's confession are essentially undisputed.

We have before us extensive material concerning all aspects of Sotelo's confession, including a transcript of the audio recordings of the police interrogation and a transcript of the audio-video recordings of the questioning by the polygraph examiner. Transcripts of testimony of the police officers, polygraph examiners, and Sotelo's mother at the state court suppression hearing also form part of the record. It is on the record of the suppression hearing, as well as the trial, that we make our independent review to determine whether Sotelo's confession passes constitutional muster.

4. In his thoughtful concurring opinion, Judge Easterbrook incisively identifies the anomaly created by requiring an appellate court to conduct a *de novo* review of the voluntariness issue. However, in light of our very recent pronouncement in *Hawkins*—and because it would not affect the outcome of this case—we leave the resolution of that problem for another day.

5. The same standard of review, of course, applies to the district court. In ruling on the voluntariness of Sotelo's confession, Chief District Judge Allen Sharp stated that his decision was "[b]ased on an independent examination of the record" and that it gave "full sway to the values in *Miller v. Fenton*, [474 U.S. 104] 106 S.Ct. 445 [88 L.Ed.2d 405] (1985)." *Sotelo v. Indiana State Prison, et al.*, No. S 86–570, slip op. at 9–10 (U.S.Dis.Ct., N.D., Ind., June 22, 1987). Plainly, the district court followed the requirement of an independent examination of the state court record.

6. However, a plenary review would not be required if the issues were whether Sotelo understood his rights and knowingly and intelligently waived them. The presumption of correctness of state court findings under § 2254(d) applies to the validity of waiver. *Perri v. Director, Dept. of Corrections*, 817 F.2d 448 (7th Cir.1987).

The first issue to be examined regarding the confession is the one specifically raised by Sotelo in the district court. Claiming that the polygraph test was "a blatant attempt to secure [his] conviction through inquisitional methods," Sotelo maintains that his confession was involuntary because the polygraph examiner lied about the results of his examination in order to scare or encourage him into confessing to the crime.

During Sotelo's initial interrogation by the police on September 29, an officer indicated that a lie detector test was available to corroborate his denial of involvement in the murder. Sotelo immediately requested that the test be administered. On September 30, after confirming that Sotelo still wished to take the polygraph examination, arrangements were made for such a test. Two officers took Sotelo from the jail to the polygraph examiner's office. Prior to taking the polygraph examination, Sotelo again was given his *Miranda* rights by one of the officers. He was also told that the test was a tool used by the police to aid in investigations and advised that he did not have to submit to the examination. Sotelo continued to indicate his desire to take the test. One licensed polygraph examiner administered the test, and another licensed examiner reviewed the test results.

Based on his review of the polygraph record, the second examiner, Mr. Magiera, determined that Sotelo was not being truthful. In accordance with accepted practice in the field, the polygraph examiner then confronted Sotelo, stating: "I looked over your [polygraph examination] records and they show that you are not being truthful on this test." Thereafter, the polygraph examiner assumed an empathic approach in his initial line of questioning. The following is an example:

Examination of Mr. Sotelo by Mr. Magiera [the polygraph examiner]:

Q  ... We're talking about a girl that was physically ill, that could force a man to do things and I know from experience all the time that sometimes these girls actually lead a man on to where he is almost out of his mind, do you see what I mean, you know. I have had this happen to me, maybe this happened here. I don't understand it but they lead a man on to a bitter passion that there is no returning. They play with it, they play with your emotions and they get you so that you have no alternative, do you follow me?

A  Yes.

Q  Now there is a lot of difference between that and between somebody who is stopping and thinking, you know what I mean, you can do this and do you see what I mean?

A  Yes.

Q  If this was done accidentally you didn't mean to do it, you should tell me that you really didn't mean to do this, it was done just accidentally, do you see what I mean, Raul?

A  Yes.

Q  This is what is important, if she lead you on, if she lead you to the height of passion, you know, that you couldn't control yourself. If she tested you to such a degree that you couldn't really help it and this thing is accidental, do you see what I mean and you lose control of yourself and you lost your good sense, do you know what I mean?

A  Yes.

.    .    .    .    .

Q  She knew that she was teasing you, didn't she?

A  Right.

Q  And she knew that she was leading you up to a point of no return almost, didn't she?

A  Right.

Q  You couldn't help yourself, could you, you couldn't help yourself, you didn't really mean to do this, did you?

A  No.

Q  Was it accidental or how did it happen, did she take off her clothes or did you tear them off?

A  No, she took them off.

(Record, Vol. II, pp. 416–419).

After the last response Sotelo began relating the facts which constituted his confes-

sion. A short time later, the following exchange took place and Sotelo first admitted striking the girl with his car:

Examination of Mr. Sotelo by Mr. Magiera continuing:

Q And you're being completely truthful now?

A Right.

Q Then what happened?

A Then I got scared so I didn't want my wife to find out.

Q Yes.

A And she was outside, you know, she was outside putting her clothes on and I got real scared and I just pressed the gas and hit her.

Q Hit her?

A Yes.

Q Where was she at?

A She was at the cemetery where they go (inaudible).

Q Was she in front of the car or in back of the car?

A In front of the car.

Q Just standing right in front of the car?

A Yes.

(*Id.* at pp. 421–422).

Shortly thereafter, the examiner called Detective Longfellow into the room and the officer questioned Sotelo further regarding the confession. A typical portion of that questioning is as follows:

Examination of Mr. Sotelo by Detective Longfellow:

Q When you hit her with it [the car], it knocked her down or what?

A I all ready knocked her down but I went over her about three (3) or four (4) times.

Q Backing up and forward like that?

A I got scared and I took off, I figured they would find tracks of me going into the bushes. I got scared.

Q That was after you backed over her, you backed over her a couple times and went forward a couple times?

A I went back and forward and then I went back and took off, the road like turns.

Q Right.

A I got scared. I couldn't control the wheel. I went through bushes, they can check it out and find out there's marks around the bushes. I got scared and I went back to Nini's and they'll tell you too, I was all shaken up. I don't want my wife to find out.

Q Now is it what your telling me the truth now?

A Yes.

(*Id.* at 433–434).

■ It is apparent from the record that the polygraph examiner did not use factual misstatements to obtain Sotelo's confession. As he testified in the suppression hearing, Mr. Magiera examined the polygraph records and formed an opinion that Sotelo was not being truthful. The polygraph examiner then followed up his evaluation by confronting Sotelo. The methods employed by Magiera in the initial minutes of the questioning were obviously used to put Sotelo at ease and create an atmosphere conducive for relating facts concerning Sotelo's relationship with the murdered girl. When later asked why he decided to tell the truth, Sotelo answered: "Because this incident was bothering me, and the man who ran the lie detector talked to me nice like a father." It is significant that this "fatherly" exchange between the examiner and Sotelo occurred only during the first three to four minutes after they met. The empathy used by the examiner was neither unfair nor did it create such a degree of psychological pressure that it rendered Sotelo's confession involuntary. Placing a defendant in a relaxed and comfortable mood by the use of empathetic conversation for three or four minutes does not rise to a level of psychological manipulation. *See Miller v. Fenton,* 796 F.2d at 607. Further, as stated in the *Miller* case on remand, "the Supreme Court has indicated that a sympathetic attitude on the part of an interrogator is not in itself enough to render a confession involuntary. *See, e.g., Beckwith v. United States,* 425 U.S. 341, 343, 348, 96 S.Ct. 1612, 1614, 1617, 48 L.Ed.2d 1 (1976), (interrogator adopted sympathetic attitude but resulting confession was voluntary)." Even where a

friendly interrogator's questioning involved misrepresentation of facts the Supreme Court has held that there was no error in the admission of a defendant's confession. *Frazier v. Cupp*, 394 U.S. 731, 737–40, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969).

■ Sotelo was a man of average intelligence. He had not been deprived of food or sleep. It is obvious that Sotelo responded to the approach of the polygraph examiner, and his confession came very shortly after the examiner began his questioning. Yet it is apparent that the examiner's "fatherly" manner did not confuse Sotelo. There is no indication that Sotelo was lulled into a belief that the stranger was a friend, rather than a technician continuing the police interrogation. The roles of the questioner and the respondent were clear. Sotelo had been advised of his constitutional rights prior to the examination, informed that the test was an aid to the police in their investigation, and told that he was under no obligation to take the test. The atmosphere was not confusing—Sotelo was in police custody being questioned by an agent of the police about the murder for which he had been arrested. Despite Sotelo's willingness to take the examination, he later acknowledged that he believed that "the machine would find out [the truth] any way." The empathy employed by the examiner during the four or five minute period did not overbear Sotelo's free will. In sum, Sotelo's fifth amendment rights were not violated by the polygraph examiner's questioning. As in the district court, our independent examination of the record convinces us that Sotelo's confession given to the polygraph examiner was voluntary and thus does not invalidate the written confession made later and admitted into evidence at trial.

We now turn to the second issue regarding Sotelo's confession—characterized on appeal as an oversight by the district court and a failure of the district court to review the totality of the circumstances surrounding that confession. Having received an unfavorable decision on the issue of coercion raised in the district court, Sotelo now claims on appeal that the district judge could not have made an independent review of the record regarding that claim of a coerced confession. Sotelo hypothecates that an independent review of the record by the district court would have disclosed the "offensive" methods used by the police officers to "extract Appellant's confession." Because the claim of improper police questioning was not the focus of Sotelo's argument in the district court, no findings were made by the district judge on that issue.

However, the failure of the district court's opinion to address every factual aspect of the circumstances resulting in Sotelo's confession does not indicate that the district court failed to consider the totality of the circumstances in determining that the confession was voluntary. We find no basis to believe that the district court failed to follow the dictates of the Supreme Court in *Miller v. Fenton,* cited in its opinion. When the district court indicated that it made an independent review of the record, we may presume that its review included a consideration of the totality of the circumstances surrounding Sotelo's confession.

■ It is neither practical nor necessary to require a district judge to issue a memorandum and order which specifically comments on every aspect of the circumstances surrounding a confession to demonstrate that the confession was voluntary. It is sufficient for the district court to address the coercive issues raised by a defendant—so long as the district judge has made an independent review of the record which in itself constitutes a review of the totality of the circumstances. An independent review of the record of the case subsumes a review of the totality of the circumstances surrounding a confession.

A federal court's independent examination and review of the record enables it to evaluate the findings of the state court, not only in the context of the specific coercion claimed by a defendant, but also by allowing it to consider all the circumstances relating to a defendant's confession. *See Mincey v. Arizona,* 437 U.S. 385, 396–401, 98 S.Ct. 2408, 2415–18, 57 L.Ed.2d 290

(1978); *Barrera,* 794 F.2d at 1270; *Woods v. Clusen,* 794 F.2d 293, 299 (7th Cir.1986).

■ Neither a district court, nor the court of appeals, is required to search the record for error. When faced with a challenged confession under § 2254, a federal court must make an independent examination of the state court record to: (1) confirm, if it can, the findings of fact of the state court; (2) make independent findings of fact if necessary; and, (3) make an independent legal determination of whether, given the totality of the circumstances, the confession was voluntary.

Again, having made a review of the record in accordance with the foregoing, it is clear that the essential facts surrounding the issue of police conduct are not in dispute. Sotelo claims that the police officers interrogated him with false facts and information. In essence, he is correct. When questioning Sotelo, the police officers—without prior verification—told him that his companions had contradicted his alibi. Sotelo had initially claimed to have been out of sight of his companions for only five minutes. At the time Sotelo was initially interrogated, the police officers did not know what Sotelo's companions would say. However, in the final few minutes of the police interrogation, after Sotelo had given his written statement, the officers questioned him several times about the length of time he had been with the murder victim out of the presence of his companions. The following is an example of that questioning:

Examination of Mr. Sotelo by Detective Longfellow:

Q  Okay, but what I'm trying to tell you is that I asked you a question as to the length of time you were gone with Carrie?

A  Right.

Q  And you said in your signed statement that you were gone about five minutes.

A  Five minutes.

Q  Five or ten minutes at the most.

A  Right.

Q  And you say that Adrian and Nini can prove that you were gone only five or ten minutes.

A  Well they could tell you how long it took.

Q  Right, now I'm telling you they all ready told us that you were gone almost an hour, they don't know exactly how long but about an hour.

A  But I'm saying this, the people in front of school could tell you what time I was there.

(Record, Vol. I, p. 225).

Sotelo continued to maintain that he was absent only a short time precluding any opportunity to have committed the murder.[7] While his companions ultimately verified the police statements a few hours later, the existence of such statements had not been established at the time when they were made to Sotelo.

■ Such deception by an interrogator does not automatically invalidate a confession. This conduct must be viewed in the totality of the circumstances surrounding Sotelo's confession. *United States ex rel. Hall v. Director,* 578 F.2d 194, 196 (7th Cir.1978); *see Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985). The use of an unsupported fact in the police interrogation of Sotelo, when viewed in light of all the circumstances surrounding this case, including the balance of the police interrogation, the presence of Sotelo's mother during that interrogation, and the subsequent conduct of the polygraph examiner, did not create an atmosphere in which Sotelo was ultimately coerced into making an involuntary confession.

To summarize the matter of Sotelo's confession, our independent examination of the state court record, which encompassed a review of the totality of the circumstances, indicates that Sotelo's constitutional rights under the fifth amendment were not violated by either the conduct of the polygraph

---

**7.** It was at this point that one of the officers offered Sotelo the opportunity to take a poly-graph exam which Sotelo readily accepted.

examiner or that of the police interrogators. The confession was voluntary.

## III. EFFECTIVE ASSISTANCE OF COUNSEL

Sotelo also claims that he was denied effective assistance of counsel. When submitted in evidence, his attorney refused the state's offer to delete references to the lie detector test contained in his written confession. Specifically, Sotelo's trial attorney refused the state's offer to omit the following statements:

Q  What made you decide to tell the truth, as to what happened?

A  Because this incident was bothering me, and the man who ran the lie detector talked to me nice like a father, and I just told him the truth. I knew the machine would find out anyway.

(Record, Vol. V, p. 1396, State's Ex. 42, p. 3).

Sotelo submits that by allowing the jury to hear references to the lie detector test in his confession, his attorney's conduct amounted to "sheer negligence and was also prejudicial."

The reasoning of Sotelo's trial attorney for allowing the reference to the polygraph exam to be admitted in evidence was never explored in any subsequent hearing.[8] The State of Indiana correctly states that "there has been no probing of the thirteen-year old decision, and therefore one can only speculate as to the motives of counsel."

■ The district court ruled on the merits of Sotelo's sixth amendment claim that he was denied effective assistance of counsel. Although we have no quarrel with Judge Sharp's analysis, it was beyond the district court's authority to address the merits of Sotelo's ineffective assistance of counsel contention because it was never raised in state court. While Sotelo did make a sixth amendment claim in state court, it was with respect to his insanity defense, not with respect to the lie detector test. Therefore, the state courts have not had an opportunity to address the merits of the lie detector allegation, which made its debut before the district court.

■ Because the ineffective assistance of counsel argument relating to the reference to the lie detector test was never raised in the state courts, neither the district court nor this court is able to reach the merits of the issue. If a petitioner fails to raise an issue in state court proceedings, he cannot raise it for the first time in a federal habeas corpus petition. *Washington v. Lane*, 840 F.2d 443, 445 (7th Cir. 1988). It is axiomatic that all claims raised in a federal habeas petition must first have been presented to the state courts, i.e., the state courts must have had a prior, fair opportunity to address them. 28 U.S.C. § 2254(b); *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). Issues that could have been raised on direct appeal, but were not, are generally considered waived for purposes of the Indiana post-conviction remedy.[9] *Williams v. Duckworth*, 724 F.2d 1439, (7th Cir.1983) *cert. denied*, 469 U.S. 841, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984); *See Greer v. State*, 262 Ind. 622, 321 N.E.2d 842, 844 (1975).

■ Waiver in state court of a specific issue prevents federal habeas corpus relief based on that same issue absent a showing of cause and prejudice. *Cartee v. Nix*, 803 F.2d 296, 303 (7th Cir.1986); *United States ex rel. Spurlark v. Wolff*, 699 F.2d 354, 361 (7th Cir.1983). Sotelo has failed to show "cause" and has not explained why he did not raise this argument in state court; therefore, he waives this claim in federal court. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2648–9, 91 L.Ed.2d 397; *Cartee*, 803 F.2d at 303.

8. Although allowing such a statement to be admitted into evidence could have been consistent with Sotelo's insanity defense.

9. Waiver is a separate question from exhaustion. The exhaustion requirement of § 2254(b) refers only to remedies still available at the time of the federal habeas petition. *Enole v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982); *Williams v. Duckworth*, 724 F.2d at 1441 (7th Cir.), *cert. denied*, 469 U.S. 841, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984).

Sotelo, like the petitioner in *Williams*, is "asking a federal court to consider a matter that he chose never to present to the state court." As in *Williams*:

Perhaps this was a "deliberate by-pass" of the state court, see *Fay v. Noia*, 372 U.S. 391 [83 S.Ct. 822, 9 L.Ed.2d 837] (1963), in the hopes that the federal forum might be more hospitable to his claim; perhaps petitioner was not seriously troubled by his counsel's performance, and was merely casting about for an additional issue when he drafted his habeas petition. In either case, it would be inappropriate for a federal court to become involved.

*Williams*, 724 F.2d at 1442.

## IV. CONCLUSION

Based on our independent review of the record, we AFFIRM the district court's holding that Sotelo's confession was voluntary.

The conduct which now forms the basis of Sotelo's claim of ineffective assistance of counsel was not raised before the state court, was thus improperly before the district court, and therefore is not subject to our review and is DISMISSED.

EASTERBROOK, Circuit Judge, concurring.

*Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985), holds that "the ultimate issue of 'voluntariness' [of a confession] is a legal question requiring independent federal determination." A district court therefore makes its own assessment, while respecting the state court's findings about subsidiary facts. *Barrera v. Young*, 794 F.2d 1264, 1270 (7th Cir. 1986). Several appellate courts—including this one, *United States v. Hawkins*, 823 F.2d 1020, 1022–23 (7th Cir.1987)—have read this passage of *Miller* with an emphasis on the "legal" rather than on the "federal", leading them to conclude that even after a district judge has reviewed the circumstances surrounding the confession, there must be *de novo* appellate review. See, e.g., *United States v. Wauneka*, 842 F.2d 1083, 1087 & n. 2 (9th Cir.1988); *Miller v. Fenton*, 796 F.2d 598, 601 (3d Cir.

1986). Our court today engages in *de novo* appellate review, and given *Hawkins* I join the court's opinion. This approach, however, reflects neither the considerations motivating *Miller* nor those underlying the division of responsibilities between trial and appellate courts.

The question in *Miller* was whether a state court's finding of voluntariness is a question of fact for purposes of 28 U.S.C. § 2254(d), which requires federal courts to presume "factual" findings to be correct on collateral review. If voluntariness were a "fact" under § 2254(d), there would be essentially no federal review of contentions that the police coerced suspects to confess. The Supreme Court examined the history of coerced-confession law and the background of § 2254(d) before deciding that when enacting the statute Congress had not terminated a power of inquiry into confessions that federal courts long exercised. Because "voluntariness" is a characterization rather than an historical fact, and because courts seek to detect and root out police practices that states may be willing to tolerate, it was appropriate to deem the question one of law. That designation was essential to federal review of a constitutional question. 474 U.S. at 112–18, 106 S.Ct. at 450–54.

A conclusion that an inquiry sounds in law rather than fact for purposes of § 2254(d) does not imply that it is a question of fact for every other purpose, including appellate review within the federal system.

[T]he decision to label an issue a "question of law," a "question of fact," or a "mixed question of law and fact" is sometimes as much a matter of allocation as it is of analysis.... [T]he fact/law distinction at times has turned on a determination that, as a matter of sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.

474 U.S. at 113–14, 106 S.Ct. 451–52. Voluntariness is not a question of "law" in the same sense that the question whether the

*Miranda* warnings are required by the Constitution is. *Miller* treated voluntariness as a question of "law" for purposes of § 2254(d) in order to ensure *federal* review of a constitutional issue. Nothing in the reasoning of *Miller* implies that there ought to be plenary *appellate* review of the same issue—that the ultimate decision ought to be given by three circuit judges, with the district court's appreciation taken for chaff.

When allocating functions among federal judges, we ask first whether appellate courts possess an advantage that requires or justifies their having the last (here, only) word. Disputes about characterization—the effect of language in a contract; the existence of negligence, ratification, or discrimination—are treated as questions of fact for purposes of the clearly-erroneous rule in Fed.R.Civ.P. 52(a). E.g., *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986) (the definition of a statutory "seaman"); *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (the identification of racial discrimination). This is not because such things are "facts" in the lay sense. No one can identify racial discrimination or a "seaman" without marshalling facts, drawing inferences, and applying some law. The ultimate issue is a conclusion at the end of a chain including historical facts and inferences, culminating in a characterization shaped by a rule of law. Courts nonetheless treat such issues as "facts" because there is little purpose in having them resolved, independently, by two triers of the federal judiciary.

To treat a question as one of "law" for purposes of Rule 52(a) is to say that the appellate court must disregard the district judge's work and start anew. This is desirable when the court must frame the rules that govern the resolution of future disputes. The "main responsibility [of an appellate tribunal] is to maintain the uniformity and coherence of the law", *Mucha v. King*, 792 F.2d 602, 605–06 (7th Cir.1986). But this responsibility is "not engaged if the only question is the legal significance of a particular and nonrecurring set of historical facts" (*id.* at 606). Fact-bound disputes should be resolved by a specialist in the application of rules to facts—that is, by the district judge. There is little to gain, and much to lose, in holding a rerun before another set of judges. Appellate judges are less well situated to appreciate the significance of facts, even documentary facts; a sensible allocation does not squander the energy put into a case by the district court, while requiring a duplication that diminishes the time appellate judges have for strictly legal questions. The allocation of functions is an aspect of the division of labor, *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428–29 (7th Cir.1985), which has great benefits within the judicial system just as it is commonly practiced within law firms. "The duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much." *Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). And requiring three appellate judges to root about in the record and come up with their independent characterizations and inferences—to measure the pattern against their own sensibilities—asks of them what they do least well, while diverting time from functions at the core of their duties.

We said just the other day that "[t]he question whether a rule of law has been violated—a question that requires applying the rule to the facts—is normally treated as a question of fact, ... not because it *is* a question of fact (it isn't) but as a way of expressing a decision to leave the answer to the trial judge or jury to make, subject only to limited appellate review." *Dav-*

*enport v. DeRobertis*, 844 F.2d 1310, 1311–12 (7th Cir.1988) (emphasis in original). Determining whether a confession was voluntary calls for drawing inferences and affixing a characterization. The "totality-of-the-circumstances test" that applies to such inquiries under *Miller* is not a legal rule but a euphemism for a prudential and moral conclusion. The judge must decide "whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means[, as well as] whether the defendant's will was in fact overborne." *Miller*, 474 U.S. at 116, 106 S.Ct. at 453 (emphasis in original). Questions of this sort should be resolved by federal rather than state courts, *Miller* holds; within the federal system they should be resolved primarily by trial rather than appellate courts, with appellate review only for clear error.

None of the cases finding in *Miller* a requirement of plenary appellate review cites *Pullman–Standard* or *Anderson;* none discusses the difference between federal and appellate review of an issue; none discusses the appropriate allocation of functions between trial and appellate judges. Each leaps from the conclusion that voluntariness is an issue of "law" for the purpose of § 2254(d) to the conclusion that it is an issue of "law" for the purpose of Fed.R.Civ.P. 52(a). *Hawkins* is too new for a panel of this court to revise, but I trust that its conclusion is not beyond reexamination.