# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID FERNANDO ORTIZ,
               *Petitioner-Appellant,*

v.

DOMINGO URIBE, JR., Warden,
Warden, CCI Tehachapi,
               *Respondent-Appellee.*

No. 09-55264

D.C. No.
2:05-cv-06639-
CJC-JC

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Submitted September 2, 2011*
Pasadena, California

Filed November 18, 2011

Before: Arthur L. Alarcón, Diarmuid F. O'Scannlain, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Alarcón

---

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. Rule App. P. 34(a)(2).

20219

**COUNSEL**

John Ward, San Francisco, California, for the petitioner-appellant.

Teresa Torreblanca, Office of the California Attorney General, San Diego, California, for the respondent-appellee.

**OPINION**

ALARCÓN, Circuit Judge:

David Fernando Ortiz appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. In his petition, Ortiz raised a claim of a violation of his due process rights under the Fifth and Fourteenth Amendments based on the admission of his confession, which he asserts was not voluntary. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

I

The facts in this case are not in dispute.

On April 3, 1997, Robert Chen died from three gunshot wounds inflicted during a carjacking in Barstow, CA. Two months later, the police received information implicating Ortiz and three other co-defendants. On June 5, 1997, Ortiz voluntarily accompanied Sergeant Steven Higgins and Detective Frank Bell to the Barstow Sheriff's Station for questioning. During a recorded interview, Ortiz was informed of, and waived, his *Miranda* rights. He also agreed to take a poly-

graph examination to support his statements that he was not involved in the shooting.

Sergeant Higgins and Detective Bell transported Ortiz to the sheriff's headquarters in San Bernardino for a polygraph examination. Detective Kathy Cardwell conducted an interview to instruct him about the procedures she would follow in conducting the polygraph examination. The interview was recorded. Detective Cardwell told Ortiz that if he did not feel comfortable with a particular question during the polygraph examination, she would reword it until he was comfortable.

Ortiz told her throughout the explanation of the function of a polygraph examination that he was nervous. He stated that he was concerned that his nervousness would affect the results of the examination. Detective Cardwell assured him that she would help him get through the examination. She told Ortiz that "the cops" could not tell her what to ask him. She never informed Ortiz that she was a sworn deputy sheriff.

In her instructions, Detective Cardwell urged Ortiz to tell his version of the facts rather than allow his co-defendants' statements to be the only accounts of what had occurred. During her explanation, she referred to him as "young puppy" and "poor guy." She compared Ortiz to her own sons, told him that she loved him, and offered him a hug. She also urged him to tell the truth, reminding him of his obligation to his loved ones. She encouraged him "to do the right thing by [his] mom, . . . daughters and [his] lady." She further told him that the polygraph would "be a piece of cake" and that she would "get [him] through all of this." Detective Cardwell told Ortiz that the polygraph would prove "that you didn't [kill the victim] *if you didn't*." (emphasis added). At one point she also said, "[l]et's get on with it and get you cleared." When he continued to express concern that the polygraph machine would be inaccurate because he was nervous, she told him "[t]hat's why you and I will work out the questions, not *them*

[the detectives]. They can't have any say so in here, this is my world . . . ." (emphasis added).

Ortiz never submitted to a polygraph examination. During the instructions on how a polygraph examination is conducted, he admitted to shooting the victim twice. Following his admission to Detective Cardwell, Ortiz confessed to Detectives Bell and Higgins that he killed the victim.

At the time of his confession, Ortiz was 18 years old and had earned a General Educational Development Certificate (GED). He lived with his girlfriend and their two young daughters. He had at least one prior arrest.

## II

## A

On September 10, 1997, Ortiz was arraigned on charges of murder, car jacking, kidnaping, and second degree robbery in the San Bernardino Superior Court. On June 22, 1998, he filed a motion to suppress all the statements he made to the officers, including Detective Cardwell. He claimed his statements were involuntary. On April 12, 2000, the trial court suppressed the statements Ortiz made prior to being read his *Miranda* rights during the first interview. It denied his motion to suppress the statements Ortiz made after he waived his *Miranda* rights and agreed to submit to a polygraph examination.

## B

Ortiz was convicted on all counts on June 8, 2000. He filed a timely direct appeal with the California Court of Appeal, Fourth Appellate District, Division Two, in which he contended that the trial court erred in denying his motion to suppress his confession and in reading CALJIC 17.41.1 to the jury.[1]

---

[1] The jury instruction advised jurors to conduct themselves with integrity and to inform the court if "any juror refuse[d] to deliberate or expresse[d]

On June 14, 2002, the California Court of Appeal affirmed his conviction in an unpublished opinion. It held "after independently reviewing the facts, we disagree with Ortiz that the totality of the circumstances demonstrates that his will was overborne." *People v. Ortiz*, No. E029341, 2002 Cal. App. Unpub. LEXIS 5371, at *11 (Cal. Ct. App. June 14, 2002) (internal citation omitted).

The Court of Appeal concluded that, although Detective Cardwell did not identify herself as a sheriff's deputy, Ortiz should have known she was connected with law enforcement because "she was situated at the main sheriff's station, the interview was set up by the detectives who had just questioned him, she knew more about the crimes than he was telling her[,] and she offered to be with him during his subsequent interview with the detectives." *Id.* The Court of Appeal also stated it was not persuaded that "the psychological pressure the examiner applied here concerning [Ortiz's] family . . . render[ed] his statements involuntary." *Id.* at *12-13. On September 11, 2002, the California Supreme Court summarily denied his petition for review of the Court of Appeal's decision.

## C

On December 4, 2003, Ortiz filed a petition for a writ of habeas corpus in the San Bernardino Superior Court raising the claim that admission of his confession was a violation of his due process rights under the Fifth and Fourteenth Amendments. The San Bernardino Superior Court denied the petition on December 8, 2003. It held that Ortiz was not entitled to raise these issues in his habeas petition because "Habeas Corpus cannot serve as a substitute for an appeal, and matters that

---

an intention to disregard the law." The California Court of Appeal found no merit in Ortiz's arguments regarding the jury instruction. This issue was not raised in the habeas corpus petition he filed in the district court.

could have been but were not raised on appeal are not cognizable on Habeas Corpus absent special circumstances which do not include questions of evidence." Memorandum of Points and Authorities in Support of Petition for Habeas Corpus at Ex. C, *Ortiz v. Sullivan*, No. 05-06639 (C.D. Cal. Sept. 9, 2005), ECF No. 3. On April 13, 2004, he filed a petition for a writ of habeas corpus in the California Court of Appeal. It summarily denied the petition without an opinion on April 21, 2004. *Id.* at Ex. D. On September 7, 2005, the California Supreme Court denied his petition, citing its decision in *In re Waltreus*, 62 Cal. 2d 218 (Cal. 1965), for the proposition that "habeas corpus ordinarily cannot serve as a second appeal." *Id.* at 225.

### III

On September 9, 2005, Ortiz timely filed a petition for writ of habeas corpus in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 2254(a). He asserted that the admission of his statements at his trial violated his right to due process under the Fifth and Fourteenth Amendments. On February 2, 2009, the district court denied his habeas corpus petition and dismissed the action with prejudice. It concluded that none of Detective Cardwell's statements to Ortiz, "particularly when considered in context, . . . promised leniency, implicitly or otherwise." Report and Recommendation of United States Magistrate Judge at 13, *Ortiz v. Sullivan*, No. 05-06639 (C.D. Cal. Jan. 12, 2009), ECF No. 19. The district court also determined that while Detective Cardwell may have "made statements to suggest that she was not a police officer, this is a far cry from suggesting that she was acting solely in petitioner's interests." *Id.* at 14. In addition, the district court concluded that Detective Cardwell's encouragement to Ortiz that he tell the truth by reminding him of his obligation to his loved ones was "a permissible psychological appeal to his conscience," not coercion, and did not render his confession involuntary. *Id.* at 15. The district court further concluded that the "totality of the

circumstances [did] not suggest that [Ortiz's] will was overborne" because: 1) he "was not deprived of food or beverages"; 2) "[t]he interview was conducted during a single day"; 3) he "was of sound physical and mental health"; 4) he "had had approximately five hours of sleep" the night before; 5) he "was advised of his *Miranda* rights, indicated [that] he understood those rights, and waived them"; 6) he "was an adult who had two children of his own"; and, 7) he had "prior experience with law enforcement." *Id.* Ortiz filed a timely appeal on February 6, 2009.

IV

Petitions for writs of habeas corpus filed after April 24, 1996 are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, this Court looks "to the last reasoned decision of the state court as the basis of the state court's judgment" when reviewing a petition for § 2254 relief. *Womack v. Del Papa*, 497 F.3d 998, 1002 (9th Cir. 2007) (citation and quotation marks omitted). AEDPA established a "highly deferential standard for evaluating state-court rulings." *Id.* at 1001 (citation and quotation marks omitted). Under 28 U.S.C. § 2254(d), a petition for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" either: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)-(2).

This Court reviews *de novo* a district court's denial of a 28 U.S.C. § 2254(a) habeas corpus petition. *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000). A district court's factual findings are reviewed for clear error. *Id.*

In determining whether a confession is voluntary, the Supreme Court has instructed that "the Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination[.]" *Withrow v. Williams*, 507 U.S. 680, 689 (1993). A court on direct review is required to determine, in light of the totality of the circumstances, "whether a confession [was] made freely, voluntarily and without compulsion or inducement of any sort." *Id.* (internal quotation marks and citation omitted).

V

The question before this court is whether the California Court of Appeal's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or whether the court's decision was based on an unreasonable determination of the facts in light of the evidence presented when the court determined that Ortiz's will was not overborne when he confessed, based on the totality of the circumstances, including Ortiz's claim that Detective Cardwell played a maternal role during the interview, concealed her identity as a police officer, allegedly made implicit promises that Ortiz would be given leniency, and appealed to his moral obligation to his family. Ortiz argues that his confession was involuntary because his will was overborne as a result of deceptive interrogation tactics.

In *Culombe v. Connecticut*, 367 U.S. 568 (1961), the Court held that, "in enforcing the Fourteenth Amendment, [it is impossible] to attempt precisely to delimit . . . the power of interrogation allowed to state law enforcement officers in obtaining confessions[; n]o single litmus-paper test for constitutionally impermissible interrogation has been evolved." *Id.* at 601. Rather, the only "clearly established test [is that of] voluntariness." *Id.* at 602.

In cases involving psychological coercion, "the pivotal question . . . is whether[, in light of the totality of the circum-

stances,] the defendant's will was overborne when the defendant confessed." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993). The interrogation techniques of the officer must be "the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Moran v. Burbine*, 475 U.S. 412, 433-34 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "[W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Moran*, 475 U.S. at 423. Thus, police deception alone "does not render [a] confession involuntary." *United States v. Miller*, 984 F.2d at 1031.

## A

The principal issue in this case is whether the California Court of Appeal's decision was sufficient to merit relief under 28 U.S.C. § 2254(d) when the court held that a polygrapher's empathic and parental role during his or her instructions regarding the conduct of a polygraph examination, and the fact that it can record bodily reactions to questioning which can indicate whether a person is being truthful, renders a person's statements involuntary.

**[1]** The Seventh Circuit was faced with a similar question in *Sotelo v. Indiana State Prison*, 850 F.2d 1244 (7th Cir. 1988). In that matter, our sister circuit held that the empathic and "fatherly" tone a polygraph examiner used, which elicited a confession from the defendant, did not "create such a degree of psychological pressure that it rendered Sotelo's confession involuntary." *Id.* at 1249. The Seventh Circuit commented that "[p]lacing a defendant in a relaxed and comfortable mood by the use of empathetic [sic] conversation for three or four minutes does not rise to a level of psychological manipula-

tion." *Id.* The court held that "[t]he empathy employed by the examiner during the four or five minute period did not overbear Sotelo's free will [and] Sotelo's fifth amendment rights were not violated by the polygraph examiner's questioning." *Id.* at 1250.

**[2]** Throughout Detective Cardwell's instructions on the use of a polygraph examination in detecting whether a person is being truthful, she spoke to Ortiz in empathic tones. She told him she loved him, offered him a hug, and compared him to her own sons. Ortiz was made aware, however, that he needed to tell the truth in order to pass the polygraph test. When he said he was concerned that his nervousness might result in an inaccurate test result regarding his truthfulness, she would tell him "I can get you through this . . . I know what I'm doing." She reassured him that the polygraph test would "prove to the investigators that [he was] telling the truth."

**[3]** The fact that Detective Cardwell employed a maternal manner in giving her instructions to Ortiz is not in dispute. Rather, the key issue is whether the California Court of Appeal's conclusion that Detective Cardwell's comments did not rise to the level of psychological manipulation sufficient to overbear Ortiz's will was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d); *see also Sotelo*, 850 F.2d at 1250. The transcript of the interview reflects the following colloquy:

> Cardwell: O.k., but if you withhold anything from me, if you don't tell me everything you're going to cause your own body to give it up when you're in that chair.
>
> Ortiz: That's why I'm scared of . . . I'm, I'm . . .

Cardwell:  Let me ask you something . . .

Ortiz:     That if I'm on there that all of sudden
           something comes to my head and I . . .
           . . .
           I don't want to go to jail.

Cardwell:  No body [sic] does, no body [sic] does,
           but you got to tell the truth sometimes in
           life, because is it's the right thing to do
           . . . .

We agree with the Seventh Circuit that a polygrapher's empathic and parental questioning does not render a confession involuntary. We are persuaded that the undisputed evidence reflected in the record of the state trial court's proceedings demonstrates that Detective Cardwell's advice to Ortiz that he had to tell the truth to pass a polygraph examination, was not coercive. The California Court of Appeal's conclusion that Detective Cardwell's motherly or parental tone in preparing Ortiz for a polygraph examination did not violate Ortiz's Fifth Amendment rights was not contrary to, and did not involve an unreasonable application of, clearly established Supreme Court law, and was not based on an unreasonable determination of the facts in light of the evidence presented.

B

**[4]** Ortiz also contends that his confessions were inadmissible because Detective Cardwell "concealed the fact that she was a sworn officer and misled appellant into believing that she was not a police officer and that she was his ally rather than his adversary." Appellant's Opening Br. 4. "Granting that the 'deliberate or reckless' withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand

the nature of his rights and the consequences of abandoning them." *Moran*, 475 U.S. at 423-24.

**[5]** The record shows that Detective Cardwell made several statements that may have suggested to Ortiz that she was not a law enforcement officer. She never suggested, however, that she was acting solely in Ortiz's interest. A reasonable person would have understood that Detective Cardwell was acting at the request of the detectives. The polygraph was to be conducted at the sheriff's headquarters. It was arranged by the detectives after Ortiz volunteered to take a lie detector test. While Ortiz may have been deceived by Detective Cardwell's comments into believing that she was not a member of the San Bernardino Sheriff's Department, this type of "deception" is well within the range of permissible interrogation tactics necessary to secure a lawful confession by the police. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that a police officer's lie to defendant about his cousin confessing to the commission of a murder was "insufficient in [the Supreme Court's] view to make [an] otherwise voluntary confession inadmissible"). Detective Cardwell's statements did not suggest she was acting solely on Ortiz's behalf and thus, did not "deprive[ him] of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran*, 475 U.S. at 423-24. The California Court of Appeal's decision on this matter does not warrant relief under AEDPA.

## C

Ortiz further contends that Detective Cardwell's interrogation tactics overcame his will by the making of implicit promises of lenient treatment if he confessed. He contends that these promises of leniency coerced him into confessing involuntarily.

**[6]** While some of Detective Cardwell's statements may have affected Ortiz's decision to confess, they did not consti-

tute implicit promises of leniency. Her statements were intended to reassure him that if he was telling the truth, and if he was in fact innocent, she could help him get cleared. *See Fare v. Michael C.*, 442 U.S. 707, 727 (1979) (holding that officers' remarks to a sixteen-year-old juvenile that a cooperative attitude would be to his benefit were far from threatening or coercive where he was thoroughly informed of his *Miranda* rights and the officers' questioning was "restrained and free from the abuses that so concerned the Court in *Miranda*"). Ortiz knew the consequences that would flow from an admission of his guilt.

[7] The district court did not err in upholding the state court's conclusion that Detective Cardwell's comments to Ortiz did not overcome Ortiz's will.

D

[8] Ortiz further contends that the district court erred in denying the petition because Detective Cardwell improperly appealed to his moral obligation to his family. The Supreme Court has held that, in extreme cases, appealing to a defendant's moral obligation to his or her family as leverage to coerce is unconstitutional. In *Haynes v. Washington*, 373 U.S. 503 (1963), the Supreme Court determined that the defendant's confession was involuntary where police told defendant he could "call his wife only if he 'cooperated' and gave the police a statement." *Id.* at 509-10. In *Rupe v. Wood*, 93 F.3d 1434 (9th Cir. 1996), this Court concluded that in the absence of threats or promises, mere psychological appeals to a petitioner's conscience were not enough to overcome his or her will. *Id.* at 1444.

In *United States v. Miller*, the petitioner argued that his confession was involuntary because the Special Agent improperly appealed to his religious beliefs, "remind[ing] him that he had a wife and eight children who needed someone in his position to respect and that it was his responsibility to find

the courage and decency within himself to once again develop those attributes which would earn their respect." 984 F.2d at 1031-32. This court concluded that "[n]othing in the record indicate[d] his decision to confess was anything other than the product of a rational intellect and a free will." *Id.* at 1032 (internal quotation marks omitted).

**[9]** As the California Court of Appeal concluded in Ortiz's case, this type of psychological pressure is in no way tantamount to the police conduct in *Haynes*. "[M]ere emotionalism and confusion do not necessarily invalidate confessions." *United States v. Miller*, 984 F.2d at 1032 (internal quotation marks and citation omitted). Detective Cardwell simply reminded Ortiz of his obligation to his family to tell the truth and that his children were counting on him to do the right thing. These permissible psychological appeals to his conscience, although possibly making him more emotional during the interview, do not demonstrate that his will was overborne. The district court did not err in upholding the state court's determination that Detective Cardwell's statements were not coercive.

## CONCLUSION

The district court did not err in upholding the California Court of Appeal's determination that the totality of the circumstances demonstrate that Ortiz's will was not overcome and that his confessions to Detective Cardwell and subsequently to Detectives Bell and Higgins were voluntary.

**AFFIRMED**.